Movimiento Democracia, Inc. v. Secretary Department of Homeland Security May it please the Court. I'm Kendall Coffey, along with Ben Cuney. We'll be arguing for the appellants, and we're prepared to answer any of the Court's questions, but it is our plan of presentation for me to address the threshold issues of agency discretion. And we begin with what the judge stated at the end of the decision, which is the Court neither approves nor disapproves of the Executive Branch's decision. It is, of course, our contention that this was a matter that should have been determined by an Article III judge. In explaining the Court's analysis, he stated that plaintiffs and defendants all appear to agree that Chevron deference does not apply. From there, the Court went to what he described as a mid-level deference, which he referred to as Gonzales deference. And, of course, he was referring to the alien Gonzales case. Judge Hill, you... Can I take a step back? You're talking about the decision made in the, quote, informal adjudication or not informal adjudication. How about... What do you do with this Coast Guard manual, and particularly Aids to Navigation, and the interpretation of what the Aids to Navigation means in the context of the wet foot, dry foot? Does that interpretation... I mean, the Coast Guard manual itself. What do you do with that? I had a problem in my head of figuring out what the Justice Department's responsible for and what HHS is responsible for and who you give deference to on what. Not in deciding what those documents mean. So can you help me out there? Well, and, of course, there are overlapping jurisdictions and responsibilities. We're talking about determining what is the map of the United States State Department Justice Homeland Security. A lot of voices can weigh in on that. But I didn't find that the Coast Guard criteria were particularly persuasive. They describe Aids to Navigation as any device external to a vessel or aircraft specifically intended to assist navigators. Judge, this was a lighthouse. It was a residence for most of its life. It was anchored on submerged lands, which are clearly the territorial land of the United States. Well, it's clearly an Aid to Navigation. The question is, there are Aids to Navigation that are on dry land, and there's Aids to Navigation that are on wet land, right? And there are Aids to Navigation that are a mere device, which is what's referred to in the policy. And in this case... Where does it say that it's a mere device? A device, not a... There's something that clearly said it's not a lighthouse? I was reading from footnote three of Judge Gales's decision. And to address your question more broadly, Your Honor, for this to be treated as an informal adjudication, there needs to be an adjudication. This was a far cry from Elion. I was starting to see... That wasn't my question. My question was, in interpreting the Coast Guard manual, and... The Coast Guard manual as an interpretation of wet foot, dry foot, where's the deference lie? Well, the deference to an agency interpretation is based on how persuasive it is. We assert... Don't you start with, does this agency have the authority to interpret this statute? Don't you start there? Because, I mean, if it's not the properly delegated agency, then why would you listen to them? We do. And we would certainly say that the Coast Guard has the authority to enforce the statute. We don't contend that they have the authority to determine the maps of the United States. And the fact that they have jurisdiction, if we look at the, for example, the Meade Corporation case, there's no question that the customs authorities had the jurisdiction to enter rulings on what would be a proper classification in that case for whether the day planners constituted diaries. But the Supreme Court nevertheless said that when you have an internally analyzed ruling of interpretation, that that does not get elevated deference. That was treated as a skidmore matter entirely. And that's what you have here. You have the Coast Guard talking to the Coast Guard, making an operational decision, and that kind of operational decision is certainly something that, under the Supreme Court's decision, deserves skidmore deference. And it's a far contrast to Elion. Your Honor, you recall all of the different prior-to-litigation interviews that were conducted in the Elion Gonzalez case. They interviewed Mattis Sleasis, they interviewed Lazaro, they interviewed Juan Miguel Gonzalez twice, and then entered a written decision on January 5th of that tumultuous year. But this case is much different from the Elion Gonzalez case. Elion Gonzalez was physically brought to Florida where he set foot on dry land. That's not the situation we have in this case, is it? Well, there are factual differences, but I think that... Important factual differences. Well, he was interdicted at sea, and then he was paroled into the U.S. So there was actually never a question of whether he was a dry-foot arrival. We contend, and of course the issue here, is whether this federal building, which had housed federal employees for many years, was in fact arriving at the United States. But the other difference, which I think bears very favorably for our position, is that there was indeed an informal adjudication in Elion. And that that was what triggered, according to the opinion, some Chevron deference in the first instance. We don't have that here. And just as prosecutors calling police and saying, it's a good arrest, or it's a good stop, or whatever, that's not an informal adjudication. We have no deference, then, or kind of... Where are we? We're just going to guess as to what the limits of the United States are. First of all, the wet-foot, dry-foot rule, that one is approved by OLC, approved, recognized by the courts. Wet-foot, dry-foot, we got no problem with that, right? That's correct. Our problem is deciding what's wet-foot and what's dry-foot. That's the issue here. All right. So, if you say there's no deference to this informal adjudication, and there's no deference to the Coast Guard manual, how am I supposed to decide what's wet-foot and dry-foot here? Well, I don't suggest that the Coast Guard manual should be ignored. It's a matter of how persuasive is it. And that's what... What's persuasive on the other side? That is what we believe should be an Article 3 judge's analysis of the history of the Lighthouse. We talk about that in our papers, and a number of different legal principles and statutes, everything from the Continental Shelf Law to, frankly, the Treaty of the UN Convention on the High Seas. Ultimately, our position is, whatever you call this, it's not an informal adjudication. Once that is recognized, then the standard of deference should be skid more. And I'll just make one other point, Your Honor. They insist in their brief that APA standards do not apply to this particular process, because they say it's an immigration matter outside of APA criteria. So, whatever this is, we submit it's an interpretation conducted in the course of a Coast Guard operation. It deserves our personal respect for the work they do, but it doesn't tie the hands of an Article 3. All right. I'm sorry, Judge. No, that completes your time. I just wanted to summarize by saying, from our standpoint, the determination of what constitutes the United States of America should be entrusted to the judges of the United States of America. All right. Thank you, Mr. Coffey. Now, is your co-counsel going to go now, and then the government? Right. Mm-hmm. Another familiar face. Welcome back. Thank you, Your Honor. Uh-huh. Ben Cuny, as co-counsel. Your Honors, I rise to address the issue that Judge Rastani and Judge Hull have commented on, and that is the status of the lighthouse. We do agree that the Coast Guard manual is an interpretive manual, but nowhere in the cited manual, nowhere in the district judge's decision is there any Coast Guard determination of locality of lighthouses. There is, for example, there are, for example, lighthouses on dry land, lighthouses on piers. All the Coast Guard manual does is identify what is the functionality of a lighthouse. It can be a house where people reside, and there is testimony in this record not relied on by the administrative determination that this was a living house. The question is, where is that living house? There's testimony in the record. It was abandoned. It was abandoned in 2015. It had been utilized, but an abandoned house is no longer. It does not derive itself as no longer being property of the state of Florida, property of the United States. There was undisputed testimony at the hearing, undisputed testimony. This was Hosea Brew, formerly with the Department of Transportation, which, by the way, is an agency that has significant knowledge and involvement in this entire area, an agency that was not consulted by the Coast Guard, an agency for which consultation would be normally a part of informal adjudication to gather facts outside the agency as opposed to just an operational determination. But Mr. Brew testified quite clearly that the lighthouse was the property of the state of Florida. It was deeded with a physical deed to the United States of America. It had a deed ownership. It was owned by the United States of America. It was operated by the United States of America, and people lived at that location. It was actually a place where communication was given to those individuals who lived, not just visited, but lived on that property. This is, by the way, docket entry 45, starting at pages 21, the evidentiary hearing, going through page 32, deeded to the United States by the state of Florida. Not simply an aid to navigation. What does the deed say? What is it conveying? A lighthouse? No. The deed conveys four acres of state of Florida property, 3.99 acres, to the United States for the construction of a lighthouse, not a light beam or simply a navigation device. Is this property with a lighthouse four acres still? Yes, Your Honor. And is it four acres of dry land around the lighthouse? No, it's four acres that is between four feet of water, and I think the highest point is 10 feet of water, according to- Okay. So it's all underwater? Yes. It is affixed to physical land with- Underwater. Okay. Let the- Your argument is kind of ... Okay. You want us to not pay attention to any of the governmental decisions, giving them no deference, and then we interpret the law, the statutory law of what is the United States for purposes of the Immigration Act, and we've got wet foot, dry foot. So your argument is because this is within the territorial limits of Florida, and this piece of land was in the territorial limits of Florida, and because it was a habitation at one point, it satisfies the dry foot rule? Essentially. We add more facts to that, Your Honor. But that's essentially it. We put those two things together, Florida land, and it was a lighthouse occupied building at one time by the United States. Put those two together, and you've got satisfaction of the dry foot rule. I'd add a third one, deeded property. So as opposed to simply an expanse of water deeded property, meaning identifiable property. I would also note an important item. It's listed on the National Register of Historic Places. Again, that lighthouse is a place in the United States. And essentially, there's no difference in the Coast Guard manual between the way it defines an aid to navigation in this lighthouse, as it would the aid to navigation of the dry foot rule. You can only buy a boat. That is plainly the United States. And what we have in this case, and finally, Your Honor, is that the Seven Mile Bridge case, the predecessor of Movimento case, Movimento 1, makes clear that judges are to make these decisions about localities in the United States. That's something that the agency should not have been able to do, and their decision should not be entitled to any binding authority on the district judge. Thank you, Your Honor. I got one more question. Yes. Okay. It seems to me that what the INA means is the business of the Justice Department, right? Or maybe not. I mean, BIA is in the Justice Department, but ICE is in Homeland Security. So I'm a little confused on this. But the Justice Department is representing the government here. Do we own any deference to its litigation position? Your Honor, we've cited a number of cases that make clear the United States Supreme Court has said in a supplemental authority case, but there are other cases that we've cited in the brief, that litigation interpretative positions are entitled to essentially no deference whatsoever. They're entitled only to the weight that Christensen gives, the extent that the interpretation has the power to persuade. And that supplemental authority was the Overtown v. Volpe case, but it just mirrors other cases cited in the briefs. Before you sit down, I want to make sure I understand the facts. And the people who came to the lighthouse, the Coast Guard then returned them home. They took them back to Cuba. Is that what they did? Sort of, Judge. Technically— Did they parole them in the United States? Put them in jail in the United States? They took them back? No, no. The argument is that the authority was brought into the physical confines of the United States. We say it was the United States. Twenty-four of them, 23 were sent back to Cuba. Seventeen of them have been sent to a third neutral country. Not to the United States, but to another country. And three of them— Is that because they wanted to go there as opposed to back to Cuba? That's because at Guantanamo, where they were taken from the lighthouse to Guantanamo, they presented a credible fear of persecution in the higher standard. And 17 of them were relocated to a third country. Well, what's the third country? It's not in the record, Your Honor. I do know, but it's not in the record. Well, what is it? I'm just curious. It is Australia. Okay. And those individuals, our clients, have maintained that they intend to and had intended to arrive at the United States and seek asylum in the United States. So, 21 went back to Cuba and 17 went to a third country. I think they're in Australia or are they in that refugee island? They are in Australia. In the real Australia? Yes. Okay. To the extent. So, 17 have been sent to a third country and then the rest were sent back to... And they were all on one boat. Yes, Your Honor. It was a homemade vessel. Right. And then when the Coast Guard came, they didn't really intend to go to that lighthouse. They were coming all the way, but the Coast Guard intercepted them and so they then went to the lighthouse. Slightly different. The boat started having problems and the individuals went to the lighthouse. They were found on the lighthouse by the Coast Guard when the Coast Guard got a radio report and saw the vessel. Yeah. I'm not sure all that matters. I'm just trying to have a context of this. But in context, they did locate that lighthouse as a fixed place that they believed was the United States of America. All right. We'll hear from the government at this time. Thank you, Judge. Mm-hmm. And you reserved your full four, Mr. Cuny. Mr. Gavore? Mr. Gavore. Gavore. May it please the Court and good morning. So this case is actually legally, in the government's position, relatively unremarkable. It has a rich factual basis, but the questions of deference and adjudication are quite straightforward. What did occur on May 24th of 2016 was an informal adjudication. The Administrative Procedure Act of 1946 carries with it within the law of this circuit no positive law on the procedures that need take place for an adjudication. And to the extent that my colleagues on the opposing council are arguing that this was not an adjudication, that one should not have taken place, then there's no waiver of sovereign immunity. The APA does apply. What was the adjudication done by? So the adjudication was done by the United States Coast Guard with consultation. With an attorney, right? Excuse me? And I thought it was like a JAG attorney or something. Yeah, the Lieutenant Commander MG. So what he did was he received from District 7, which is the U.S. Coast Guard district here through channels, initially on May 20th, notice of the interdiction. An interdiction was taking place and a determination was made of feet wet. Color photographs were sent of the migrants. Disposition or explanation that the migrants were resisting interdiction, that they had armed themselves with metal pipes and debris took place. The Coast Guard communicated that once the interdiction was initiated, two of the 24 voluntarily left the vessel and came on to the Coast Guard small boat without making it to this navigational aid, that's 6.5 nautical miles off of the coast of the Cudjoe Cay. And on the end of May 20th, of the 24, 21 were in Coast Guard custody. On the 21st of May, another two of the three remaining were found once more on the lighthouse. They had climbed up to the top and had hit, I believe. And then a third was found on the final of the 24 was found on a piece of flotsam floating perhaps I think another nautical mile closer to the Cudjoe Cay, but still over five nautical miles away. If we don't give any deference to the adjudication, then where's the deference here? Do you think, where should it be? I mean, we've got the Coast Guard manual, we've got the wet foot, dry foot rule. I guess we're all okay with that. And then we've got the Coast Guard manual. Is there anything else that guides us that we give deference to? I think there is, Your Honor. So there's two questions of deference here. One is the deference that the Administrative Procedure Act provides in 706-2A, arbitrary and capricious. That is statutory deference. The standard for that is the agency needs to rationally connect the facts found in the conclusion made. I think the broader question that my opposing counsel articulated was the question with regard to agency interpretations of law. And in this circumstance, that deference, Skidmore at minimum, but under the law of this circuit, Gonzales' deference is appropriate, would vest with the Department of Homeland Security. The two Office of Legal Counsel opinions from 1993 and 1996, and the 1999 Meisner memo from the commissioner of the INS that created the wet foot, dry foot, so-called wet foot, dry foot policy, in addition to the 94 and 95 migrant accords, all predate the creation of the Homeland Security for the Homeland Security Act of 2002, which followed the September 11th attacks. And there was a large reorganization within the executive branch that also principally focused on the immigration infrastructure. So it is legacy Justice Department. That is correct. But the interpretation of law now, I think that is salient, would be this manual. Now, correct, the manual does not carry with it the force of law. So under Christensen, Mead, and then Barnhart, that follows it. The eligibility for deference would be Skidmore at minimum, to the extent it has the power to persuade. But then this court has its Gonzales case, Gonzales 2 in particular. I just want to go back to the OLC. So I guess the OLC can have different hats. They have the hat where they're the Justice Department, and then they're the hat where they're making a decision to harmonize agencies. So you say the original decisions that we're talking about were Justice Department, kind of in the same shoes that HHS would be now. DHS. DHS, sorry. As well as the State Department. So I think if you want to look to good language that this court can observe with regard to what does dry feet mean under the wet foot, dry foot policy as applied here, I would refer you to the 1996 OLC memorandum, November 21. Yeah, I got that. And it states, undocumented aliens seeking to reach the United States aboard a vessel that has reached the internal waters of the United States at the time of interdiction would have not come ashore on the United States, quote, dry land, end quote, are not entitled to deportation proceedings or other proceedings under the INA. So the question here is this. Using that language and that language alone, the reference is inner waters, not even territorial waters which the United States extended at the end of the Reagan administration from three miles to 12 miles. The lighthouse at play here is actually on the seaward side of the baseline. So they're not even in the internal waters of the United States. So that's a key distinguishing fact from let's say a seven mile bridge that had a break in it that District Judge Moreno opined on in 2006 which the government respectfully disagrees with but this is law of the case for that particular body. Here, it seems that what opposing counsel, the only theory that would be based on law and supported by anything would be an impossible standard to classify this lighthouse as an island. Note that this lighthouse does not carry with it its own extension of the territorial sea of the United States. It's within the territorial sea of the United States. So it's not that a 12 mile radius emanates from it. With regard to the particular provisions of the Immigration and Nationality Act that are interpreted such that deference is appropriate in the law of this circuit, Gonzales deference or in the absence of that, Skidmore deference, that would be squarely within the Immigration and Nationality Act. It's as immigration law applies. So it's this rich lattice work of different intersecting areas of law and certainly the But it comes down to a simple Title VIII question. 1101A38 states, the continental United States, that's one piece of information. Continental means terra firma. Every piece of information that undergirds the then wet foot, dry foot policy that was rescinded in January 12th of this year indicates terra firma. And with regard to the Coast Guard's manual in a particular D1 interdiction of undocumented aliens, the manual states relatively clearly that a lighthouse or navigational aid, something like this, would not qualify. The manual does observe that even as a question of law, let's say a bridge or something that is connected to land, physically connected, you could walk from the bridge to terra firma on dry land, could, as a matter of grace, be classified dry foot. But that is not the case before this court. Obviously, when you have a lighthouse, which is an aid to navigation that is on dry land. So I guess your argument is that D1 does not refer to that. Correct. So this lighthouse is at all times submerged under four feet of water. It's nine pylons drilled into 10 feet deep in a core reef. In fact, after it was decommissioned in 2015, the record provides on page 55 of DE 12-1 colon 55, that the replacement structure is little more than a pole or a pylon with a very powerful solar powered LED on top of it. That's certainly not dry foot. And I think these arguments that somehow a historical patina, the fact this was built in 1880, that at one point it physically housed some persons, the fact that it... I think the argument is that it's property and it's been deeded by Florida to the United States. So it is property. It is land. And so it qualifies. That's their primary argument. So in response to that, Judge Hull, the fact that this was... They're not deeding waters. They're deeding land and it has a structure on the land. And they say they made it to land. Your Honor, it's submerged land. And it is the property of the United States. The territorial sea of the United States was actually expanded from three miles to 12 miles in the late 1980s. But you can land on the beach. And at high tide, the beaches submerge land. I mean, the question is, do they make it ashore? Do they make it to land, I guess? Well, I think what you're identifying, Judge Hull, is perhaps a more gray area question. Like a sandbar, for example. Under the law, the interpretation of the Immigration and Nationality Act, based on all of those that are articulated orally and also in the papers, if the median waterline is... If at one time of day that sandbar exists and that median waterline happens to be above it, that's actually technically wetfoot. But here... It's still wetfoot. Correct. Is that what they refer to as elevation? Yeah, it's the average elevation. But here, we're talking six and a half nautical miles off of the coast. This is a very different circumstance. And the fact that it happens to be drilled into seabed or that it is classified as property, it is property of the United States just like a buoy would be, does not, under immigration law, render that dry foot for the purposes of special status that humans were afforded under that law. Since this policy has been repealed, do we have a lot of these types of cases? My understanding is that... Or do you know? My understanding is that the rate of interdiction has dramatically dropped. That is not part of the record, but I believe the court can observe... No, I'm not talking about the rate of interdiction. I meant cases in court where people are disputing whether they got wet foot, dry foot under a policy that no longer exists. My belief, the answer is no. This is no longer... Pending cases, like do we have any... Like Judge Marino had his case, and he ruled in that case. Are there other cases we know about? I am not aware of any. Okay. The current order went, broadened, I guess, no, it restricted dry foot, right? Correct. So is that the one that's in place, the one that happened in January, a restricted dry foot? Yes. So the policy of the United States on January 12th in the last administration is to rescind that policy. So the dry foot aspect of it is rescinded. And on June 16th of this year as well, the President's National Security Memorandum on strengthening the relations between the United States and Cuba indicates in Part 2, Policy, Subpart E, that that policy remains rescinded. So if somebody makes it to land, we're going to repatriate them? Is that what we're going to do? We're going to send them back? Well, if someone makes it to land of Cuban origin or just of any origin, the United States no longer has a policy, but specifically for Cubans, to guide discretion for special parole granting authority to favorable adjudication to parole them in. Okay. So they can decide it on an individual basis whether to parole them in the United States or go back? Yeah, that is natural. So they're treated like everybody else? Correct. So the present state of the law is case-by-case determination on whether parole may be appropriate. What happened to wet foot, dry foot? That is rescinded.  That policy is rescinded. So let's say persons, let's say today, if Cuban migrants were interdicted by the White House, the wet foot aspect would continue to exist, which is if they are interdicted at sea, they would be eligible for manifestation of fear and well-found, and then they would- They still could be paroled, but there won't be this presumption of special parole treatment if they made it to land, I guess. Well, if they're interdicted at sea, they are not paroled. Okay. This would be if it's like a land border or if they make it to, let's say, the pier that physically is connected to land. That would be the case. So with the remaining time that I have, just to sum up, the adjudication that occurred on May 24th of this year, of 2016, is sound under the Administrative Procedure Act. Overton Park, this case from 1971 that opposing counsel provided late last night, is largely modified by Camp v. Pitts, a 1973 case that indicates that affidavits, to the extent that they provide explanation of the reasoning, they provide guidance. Not the reasoning itself. Never heard of Overton Park. You're just young. No, it's one of my favorite cases, so I'm certainly well aware of it. And the deference as to the government's interpretation of law is eligible under this circuit's authority to Gonzales' deference because it relates to immigration law with foreign policy implications. And that deference is considerable. Unless there are no further questions, the government rests on the papers. All right, Mr. Cuny, you have four minutes in rebuttal. The government acknowledged in the lower tribunal and in the papers that Skidmore deference, only the power to persuade, applies under any circumstances but for the gloss of Gonzales. Gonzales was the prototypical informal adjudication case that involves circumstances that are ripe for informal adjudication, a resolution of disputed facts. Who was the informal adjudicator? The Department of Justice was the informal adjudicator with ultimately a decision made by the, ultimately, the Attorney General, but it was through the Department of Justice. Move that over to the Department of Homeland Security, and what we have is the equivalent of a law enforcement agency, the U.S. Coast Guard. It does other things, but it's a law enforcement agency. So the equivalent in an Elian Gonzales case, the FBI making a determination that Elian Gonzales is appropriately taken and returned home to his father. This legal officer who is making this arguably informal adjudication was also doing it pursuant to advice, wasn't he? Within, totally within the structure of the United States Coast Guard, the enforcing agency, not within the structure of the department, again using the Elian Gonzales analysis. The law enforcement agency makes the determination, and the United States in litigation says that's the analysis that applies. We say that's not informal adjudication, and there is no case that suggests, authorizes informal adjudication. Again, the Gonzales case. Discussions, input, going outside the agency to speak with people, and then ultimately making a resolution that is determined at, it doesn't really matter where, but the highest levels of the Department of Justice. Yes, the overall department that essentially oversees the agency. That's, in terms of big picture law, why this cannot be informal adjudication and cannot be judicial deference. Let's assume we have no judicial deference here, and we need to determine if they're physically present. And then we looked at the wet foot, dry foot policy, right? Yes, Your Honor. Why, even on de novo review, is it error here, just to say this was not a sure on the United States? On de novo review, the facts in this case, as presented before District Judge Gales, are undisputed as to the points that we have raised, that being a piece of property, identified, deeded, constructed. A piece of property that, contrary to what the United States averse, is, always has been, a part of the state of Florida. The state of Florida conveyed that property. And historically, if it was not part of the state of Florida. So you're saying a de novo review, you absolutely win, and therefore you want no deference? Or you want Skidmore deference? What is it that you're saying? I know you don't want Gonzales deference. Right. Okay, so do you acknowledge Skidmore deference applies? We think that the Christensen deference, which says it's only as good as the persuasive power, which requires the judge to analyze all of the items. We think, in fairness, the District Judge should be given the opportunity to hold the hearing at which he, the District Judge, will make the decision based on the competing persuasive power to proceed with the facts. So you concede some deference is due, but it's Christensen, is what you're saying? Yes, Your Honor. We don't totally dismiss away any position of the parties.  Thank you, Your Honors. We ask the court to vacate the decision and remand the case for further proceedings, or if the facts are clear, to find that the wet foot, dry foot policy was established for dry foot. Thank you, Your Honors. Thank you. The case is submitted.